Thank you. May it please the Court, Andrew Parnes on behalf of Mark Lankford, I would like to reserve 10 minutes for rebuttal. I try to keep track of it, and I'll try to remind you. I will try to do so. Your Honor, since this Court, sitting on Bank, recently stated, Our criminal justice system depends on the integrity of the attorneys who present their cases to the jury. When even a single conviction is obtained through perjurious or deceptive means, the entire foundation of our system of justice is weakened. In this case, Mark Lankford was never told about a plea agreement that was entered into between the prosecution and Brian Lankford's defense attorney at his trial. We now know that there was, in fact, such a plea agreement, and, in fact, it was an enforceable agreement that has resulted in Brian Lankford's sentence to an indeterminate life sentence. What happened at trial was that the prosecutor, when this issue was raised, said there is no deal. He called Brian Lankford's defense attorney. Let me just say, that issue is here only at the moment on the question of the procedural default. That's correct. You know, if you get over the procedural default and you got to the merits, and I'm not sure we could address the merits here now, the thing that bothered me about the issue, and tell me if I'm wrong as I understand the facts, is that Brian Lankford told the jury that he did have a deal. He told them that there was a life sentence that he would receive. Did the jury hear anything other than Brian Lankford's statement? Yes. First of all, he did not say that he would receive a life sentence. Well, he said there was an oral arrangement. No, he said that there was discussions that he would probably receive that. Well, we can check that, but my reading of the record was that he did tell them that he would receive it. But how else was the jury told other than what he said? Well, what was told was that there was an immunity agreement that would basically, if he testified, was a written plea agreement given to the jury, presented to the jury that showed that he would have immunity from anything he testified to at that trial. I was trying to find that, and I couldn't tell on some occasions. It was unclear to me whether the jury was there or not. Did the jury ever hear the State say that there was no deal for a life sentence, or did they hear the judge say that? The jury heard that when Brian Lankford was asked if there was a plea agreement, his answer was no. I have not been given a written plea agreement. No, you haven't been given a written one. But my question was, did they ever hear from anyone other than Brian Lankford on this subject? The jury heard only from Brian Lankford and the fact that there was an immunity agreement that was different from that. And the prosecutor, in closing argument, said to the jury, the immunity agreement was really not all that much. Brian's already been convicted. The immunity agreement only applies to Idaho County. We didn't have to get that on the witness stand. He stressed to the jury that there was no binding agreement. There was no nothing, no quid pro quo for his testimony other than the immunity agreement. And that immunity agreement is very different from the sentencing. I agree with you about the immunity agreement. It's different. How much damage was Mr. Pitchmore able to accomplish on cross in the sense of – I mean, there's some cross that says, you know, you've got a deal and is therefore – I mean, it's not as though the jury didn't hear some undermining cross-examination and testimony. There was only – So all I'm worried about is the prejudice problem, the strickland, if we can get to that. Right. Well, the cause and prejudice issue is one that says basically – Well, I'm not even on cause and prejudice on procedural default. I'm assuming we can get past that. And I'm just on what's the – excuse me, that's strickland. What's the prejudice in the sense of harmless error? Okay. The prejudice is this. For example, in the Hayes v. Brown case that was recently decided, in that case the jury was told that the witness had transactional immunity for everything that happened in related to the murder. What they weren't told and what this Court reversed on was the fact that he was going to get – the witness was going to get some felony charges dismissed. This Court found in Hayes that that was prejudicial because it – the transactional immunity that was offered to the witness, James, in the Hayes case, was not that much. It was of no value. It wasn't significant. Well, what's significant in this case is the fact that Brian knows beforehand that we now know it's a binding deal that he is going to get. Nothing that is subject to question or whatever. It's very different to say to a witness, do you believe this is going to happen or we know that the prosecutor has offered you this. We need to have it. And that difference is very important. Also, the significance of Brian's testimony is very important. Mr. Alberts testified, and as the prosecutor, testified subsequently that he was worried that without Brian Langford's testimony convicting Mark Langford, it might be difficult in view of his not having – that means Mark not having handled any of the credit cards other than one handwriting sample, which was a difficult question. It's clear that Brian's testimony is critical to this. Critical. Can I ask you a different question? Sure. Which will deflect it, but I know that even with a half an hour, the time is short. What would have happened had Mr. Fitzmaurice engaged his own forensic pathologist? That is to say, we've got testimony in the hearing in front of the district court here on habeas that it fell below the standards of practice, not to have engaged his own independent pathologist. How would that have changed not only we'd get testimony, but how might that have changed appropriate trial strategy? Well, I think that what happens here is that he, by not doing that, he limits what he thinks is important in the case. He focuses the case only on what Brian might have said differently in a few statements. But he doesn't go to the heart of the case, which is that the way in which Brian testified that the killings occurred did not happen that way. And he never asks the critical question. He knows beforehand that Brian has admitted to Mark and Mark has told Fitzmaurice that Brian committed this with a rock. And that our forensic pathologist says that is absolutely consistent with the way in which the skulls were damaged in this case. Had he consulted a forensic expert, he would have brought forward even the question that was asked. The state says, well, he couldn't have gotten these questions in. He got questions in about a limb or about a shotgun, butt of a shotgun, a stone. Nothing was focused on the fact that Brian was lying about the critical issue, which was the cause of death. Now, Brian testified at trial here that Mark hit the two victims with this 12-inch nightstick. At this trial he did. Was he pinned down? That is to say, had that been his testimony at his own trial? No. Well, his testimony at his own trial had been, yes, it was a small club. At his trial, he stated that it was he had never seen it before, at Brian's trial. He said it was a small club. He took it out of his pocket and never seen it before. His statements to the police were that it was a nightstick that Mike, that Mark carried in his car. And we know that's not it. What I'm driving at and what I'm concerned about here is that, well, assume that he gets a forensic pathologist and he gets the same or the same forensic pathologist who testifies in front of the district court here who says the overwhelming likelihood, I'm paraphrasing, is that this was a rock and it's very unlikely that it was a stick of the sort that's described here. Could Brian have changed his story knowing that that testimony was coming? And I think your answer is no, because at his own trial he testified he hit him with a nightstick. The only difference is where the stick came from. Right. And, in fact, he had testified, he had given a statement as a nightstick. It turned into a different form of club. And also the evidence was that this, from our pathologist, was that maybe it's possible that this club could have caused this damage, but it would have had to have been a horrendous force. And there's no evidence of that. Brian is saying he just knocks him on the head. In addition, in addition, at the sentencing and at the motions for new trial, the use of a forensic pathologist would have come to support Brian's new testimony that would confirm what Mark had told the pre-sentence investigator, that Brian had done this with a rock. And he gave up those opportunities as well. If you had testimony at trial from a new independent forensic pathologist, that's the same testimony that we got in front of the district court here on habeas, would it have then been a mistake to keep Mark off the stand? Because if all you do is put in the forensic pathologist's testimony, all you do is to say, well, he didn't do it with a stick. Is there some other way you can get the story in front of the jury that, well, actually Brian did it and he did it with a rock? Well, first of all, the burden is not on the defendant to show that Brian is lying. We just have to raise a reasonable doubt at trial. And so using a forensic pathologist to go specifically to the cause of death, which is what is at issue in this case, really, is the cause of death. And Mr. FitzMartin said, I didn't even focus on it. I didn't think about it. And all he cross-examined on was where the little, where the hits were, whether in the front or the back or so on, but not to the severe damage that was done. It could have been introduced without Brian's testimony, without Mark's testimony. I understand. It could have been. They could have asked Brian about statements he had made. Did he ever say that he had done it with a rock? Did he ever say that to anybody? Had he ever made those statements? You would have been able to. And say again, what statements has Brian previously made? Brian had not. He had not. The only statement prior to the trial was a statement to Mark. Right. Now, it's possible that he. So if he's asked, didn't you tell Mark X, he can say no. He can say no, and then it's open. Well, it's not consistent. He lied about that. So it opens that whole door. It's not necessarily dependent on Mark testifying. But, of course, when FitzMartin asks about why Mark didn't testify, his response is, well, when he stood up and cross-examined for five or six pages and asked Brian, we got out through that, the idea that Mark wasn't there. You can read those four or five pages. There is nothing there that suggests that Mark was not present at the time. So I think that is really as critical in terms of what happens at the trial. And then it might also have led to a different judgment as to whether Mark should testify if they had had an expert who supported his story. Absolutely. I mean, that's the reason to do investigation. And we have to remember that this trial counsel had no investigators. But let me ask you this. If we were just speculating as did Fletcher was about what a witness might or might not have said for the prosecution if they knew what the defense was going to say. The prosecutor's story is not entirely clear. I don't think they're entirely committed as to when the death occurred or how. The only evidence they introduce is the hitting with a knife stick over at the original site. There's no the prosecutor makes some statement, which he might not have made under different circumstances, about the bodies being at that point immobile or at least rendered so incapable of further motion. But sort of not saying exactly when the death occurred, but saying that Mark then takes these two bodies off, alive or dead, and disappears with them for 15 minutes. So that if you speculate about how the prosecution's case might have been, they could have argued that, yes, maybe it was ultimately from a rock, and that Mark did it when he took the bodies off. Would that not have been? It is possible to argue that. But at Brian's trial, they argued that it was the jury should not believe Brian about when the deaths occurred because they put these bodies into the van, drove on a back road for 30 miles, at least an hour, and that you shouldn't believe Brian about that. About what? About Brian's statement that he didn't know whether the people were dead or alive. But the prosecution in Brian's trial asserted that the deaths occurred before they came into the van? He said it was you should not believe Brian on this because they didn't tie them up. He testified there was nobody tied up. They were just lying in the back. These bodies were lying in the back of the van. That was testimony at Mark's trial as well. And essentially that there was no movement, nothing. He didn't hear any peep, nothing. So that it was really unlikely to believe that they were killed up at the scene and that the only reason he was ---- Did Brian ever say they were killed up at the scene? No. He never said that. When I say up at the scene, up at where the bodies were found. Brian did not articulate that. He said I didn't hear any movement. I didn't see anything. All I know is I thought maybe they were alive, but I had nothing to base that on. He also testified that there was no blood, and yet there was blood found in the van. So Brian, there were a lot of things that are inconsistent with Brian's testimony in this case. Mr. Rourke, in a hearing in front of the district court, says as to whether or not Mark should have taken the stand, he says I don't know how you get that in front of the jury in a credible fashion, that is to say the Rock story, unless Mark takes the stand, tells the jury under oath that that's what happened. Some cases where you can't put your client on the stand, your defendant, I heard nothing in the testimony today that would have given me any reason not to put my client on the stand under the very same circumstances. In other words, your witness Rourke says ineffective assistance of counsel and not putting Mark on the stand. Do you agree with that? I agree with that based on the failure to go to the forensic person and that it is connected. And part of it comes from the state has argued, well, that wasn't really part of the claim, but it was part of the claim. It's what they raised in response. It said the only way to get this story in front was to bring Mark on. Well, if that is their argument, yes, that once you have that information, you sit down and what trial counsel do is to basically assess where they should go with the case. What do we have to do? And there was very little risk. I mean, Mark testified. He gave the same story and version of what happened to the pre-sentence investigator. Your theory is that you could get this evidence in whether or not he testified. Both. I think that it would. Your first theory is that you would get it in without him. And your second theory is that if you needed him, then a lawyer after having conducted the investigation would make the assessment, but couldn't make it without the investigation. That's right. And essentially what happened in this case was that the way it would come in without Mark testifying is simply by presenting those facts to the forensic examiner. You say it's a nightstick. Well, is it consistent with the severe fracturing that was done, the deep fractures to the brain? No, it wasn't. It's not consistent with that. Is it consistent with the rock? Well, as I understood your expert's testimony, it could be consistent with that if enough blows were made with a nightstick from enough different vantage points. Not that a nightstick couldn't do it under it, but a nightstick could not do it in the manner that Brian had testified. Right. And that it was that the fractures were inconsistent with what he's seen from the cause of death being rocks. Was the nightstick introduced into evidence? Was the nightstick introduced into evidence? No. There was a nightstick introduced into evidence. That was a nightstick that was found inside the car that belonged to my client, Mark, that was seen up at the. That nightstick was longer than this little club. It was a police-type nightstick? It was a police-type nightstick. Sometimes those have an extra little piece on them on the handle. Did it have that hand guard on the handle? I'm not sure that it did, but it did not have any connection to the. They were unable to connect that at all forensically. So that nightstick was not it. And, in fact, that's one of the issues in here is that when Brian initially says, oh, it's a nightstick that's found in Mark's car that was used, well, they find a nightstick in Mark's car, but it's not connected. So by the time they go to trial, Brian's changed his testimony about the nightstick. He says it's a little club. And at his trial, he says it's a club that Mark carried and I never saw it. At Mark's trial, he says it's a small club that was mine that I gave to Mark and I don't know where it is now. So the actual murder weapon was not in front of the jury. And so you're looking at a case, and basically Mr. Fitzmaurice, who had never tried a capital case, who had really only as a prosecutor had tried one felony case, which was cattle rustling, hired no investigators, had no experts except for one little handwriting expert, was given opportunities to do that, asked for funds, never got them, and as a result, we have this trial, which is really based solely on Brian's credibility. Was there any defense witness at all? There were no defense witnesses. Mr. Fitzmaurice never gave an opening statement. He recalled at the hearing, and again, it's a long time, it's 15 years later, he recalled that he had given an opening statement. He hadn't. He rested at the close of the prosecution's case, so there was no opening statement. And in closing argument, he argued basically that it was somehow Mark wasn't there, and the prosecutor kept saying in rebuttal, where was Mark? Where was Mark? What's going on? We know there's no challenge to Brian's story other than a few minor inconsistencies, and that's where the deal really comes. I come back to the deal because I – Before you get back to that deal. Sure. I think it was a district judge. Somebody said that we – or I guess it was the trial lawyer who said the reason for not having – not looking into the cause of death, not having an expert examine the rock question, was that he wanted to keep the focus on the alibi. But there was no alibi defense, was there? No, there was no alibi defense presented, and that's the problem. He wanted to – Who was it who said that the – was it the judge or the counsel who said the reason was to keep the focus on the alibi? I think it was the trial counsel who said basically, look, I'm trying to do – That was his explanation. His explanation was twofold. His explanation was I didn't focus on the cause of death because I just wanted to go to Brian's credibility, and I didn't put Mark on the stand because initially I just didn't – I didn't think I needed him. I – and more importantly, after he cross-examined his brother for a few minutes, that got out to the jury Mark's defense, and so I didn't need to do that. Only way down the road did he also say I was a little bit concerned about Mark's testimony in front of the jury. But that's not the primary reasons that he did it, as he testified to. And what he did, in a sense, was by not pursuing this, he abandoned every defense, any defense that Mark had to this case. And he not only abandoned it at trial, he abandoned it at the motions for new trial. Counsel, it doesn't offer an alternative theory of facts, but he has at least called into question Brian's credibility. And he's tried to do that in every way that he can, short of putting Mark on the stand. Well, not every way he can because he didn't do it through the forensic. And we've at least called – we certainly have called Mark's outburst in court, has called Brian's credibility into question in a very direct way. Well, and there's no question that he questioned Brian's credibility, but it was on a very, very limited basis. And it was only about the questions of where the hits were with the nightstick, not in the fact that he knew beforehand. This is not made up afterwards. This is not something where 20 years down the road, post-conviction counsel come in and say, oh, there's a dispute about what was told to trial counsel. Trial counsel testified that when Mark first met him, he told him exactly what had happened in this case. And yet the trial counsel did – And that account is consistent with, for example, the written account we have in the PSR? Yes. It's the written account in the PSR. It's what Mark testified to at the sentencing hearing, and it's what Mr. Fitzmaurice testified to was told to him at the evidentiary hearing. Mr. Fitzmaurice said, yeah, this is what Mark told me at the beginning of this case. And yet I did not do anything with that. And I don't think that there's evidence in the record that he made a decision beforehand not to call Mark. I mean, there's no opening statement saying you're not going to hear from Mark. There's no – there's really saying, hey, this decision was made, and it's my decision. He said that. Ms. Fitzmaurice is saying I told him not to do it. So I think that's – that's issue. I'm running out of time, so I will defer other things. Thank you. May I please have the Court, Lamont Anderson, representing the respondent, A.J. Arby, addressing the issue first of the plea agreement. There's no question that the jury wasn't apprised that there was – that Brian believed he had a plea agreement. The way this thing – I'm sorry. I didn't catch where the not fit in there. The jury was – The jury was told by Brian that he believed that he had a plea agreement. The jury was repeatedly told by Brian that he believed he had a plea agreement. When Brian first took the stand, there was an objection to his testifying by Mr. Fitzmaurice, and it was primarily based upon the immunity agreement. And as a result of the jury – the jury left, there was a hearing that took place where witnesses were called, and there was discussion of the immunity agreement. As a result of that discussion, it was learned that Brian believed he had a plea agreement. The prosecutor said, we don't have an agreement. Brian's attorney testified. This was outside of the presence of the jury. Brian's attorney, Longtee, said, we don't have an agreement. But Brian repeatedly stated, outside of the presence of the jury, I think I've got an agreement. I think it's indeterminate life. There was discussion that prior to his trial, they had discussed plea agreements, and he was even offered second-degree murder, which he turned down and went to trial. And he was going to get a significantly lesser sentence than that for that even. He went to trial. The trial court says, gentlemen, we've got a problem here because this guy thinks he's got an agreement. You guys need to work this out and find out what's going on. Twice the trial court noted that there was – that Brian believed he had a plea agreement. The jury comes back in, and Brian testifies, and on cross-examination, the first question that Mark asked Brian is, you're going to get out of the death penalty on this. And Brian says, yeah. That's a – not his words, but that first thing that Mark asked him. Mark is no longer cross-examining, and Fitzmaurice comes in, Mark's attorney, and repeatedly asks about the plea agreement. And Brian says, I've got an agreement. What was the – Was the jury told anything – did the jury hear anything about that plea agreement from anyone other than Brian? That's exactly where I was going, Your Honor. The prosecutor's response to Brian's statements was one question on redirect, and that was, well, Brian, you understand that even if you've got an agreement, the judge is the one that ultimately decides the penalty in this case. And that was the prosecutor's only response. The prosecutor didn't call another witness and say, there's no agreement. The prosecutor could have called Brian's attorney, Mr. Longteek, and said, we don't have an agreement, do we? The prosecutor didn't do that. The only information that the jury had was from Brian, who believed he had an agreement. And that was exploited by defense counsel in his closing argument. He repeatedly talked about, you can't give this man any credibility. And he listed numerous reasons why, but one of them was it's because he thinks he's got an agreement, and he's getting out of the death penalty, testifying only so that he can avoid the death penalty. The jury never heard anything except, I think I've got an agreement. That's what the jury heard. There was nothing withheld from the jury. This is not a Haynes case by any stretch of the imagination. Can I direct your attention to my problems that I think I've signaled clearly enough in the earlier part of the argument, with the guilt phase contention that Mr. Fitzmaurice was ineffective. And just to sketch it out in sort of how I'm thinking, it seems to me pretty clear that he was ineffective in not engaging his own independent forensic pathologist. Had he done that, I assume we would have gotten something more or less like the testimony we're now getting out of Dr. Gray in front of the district court. We're also – I'm also thinking it may well have been ineffective, as Mr. Rourke says, particularly once he gets forensic pathology testimony that says, you know, this couldn't have happened with a nightstick the way that Brian says. It could have. It had repeated blows with extraordinary force, but it's much more likely that this was a very large rock. Knowing that he's got that testimony that's objective scientific testimony, then it seems to me that Rourke is even more right than he couched it, not to put Mark on the stand to tell the alternative story. What's your response to that? Assuming for the sake of argument, Your Honor, that there was deficient performance. And I just – I can't concede that because Mr. Fitzmaurice made it – He didn't need as a part of his responsibility to engage his own independent forensic pathologist? That's competent practice not to do that? I'm not saying it's a common practice, Your Honor. Competent practice. Oh, competent. I'm sorry. I'm saying that Mr. Fitzmaurice made a tactical decision to simply talk to Dr. Syhick, who was the forensic pathologist, did the autopsy. It's hard for me to say. No, he was not a forensic pathologist. He himself testified. Excuse me, a pathologist. That's right. I'm sorry. He specifically indicated in his testimony that he was not qualified in that way. Yes, Your Honor, you're correct. And I apologize for that. Just – he was a – just a pathologist. Right. Completed the autopsies. It's difficult for me to characterize him as a State's expert. Certainly, he was called by the State. But this is the individual that routinely does autopsies in murder cases and non-murder cases at that time. And Mr. Fitzmaurice was familiar with Dr. Syhick. More importantly, Mr. Fitzmaurice was very familiar with the fact that Brian's testimony didn't match with Dr. Syhick's testimony, with the forensics in all respects. Whose testimony didn't match? Brian's testimony did not mesh with Dr. Syhick's testimony in all respects. In other words, Brian, as I recall the testimony, said that what he saw was Brian – or, excuse me, Mark hitting the victims on the back of the neck. And Brian changed his stories multiple times about the number of times that Mark struck these two individuals. The problem with that is that Dr. Syhick testified there was nothing to the back. It was on the face. And there were a number of inconsistencies in Brian's testimony that were brought out on cross-examination by defense counsel, Fitzmaurice, and he actually compared Brian's testimony with Dr. Syhick's testimony. And as a result of that, Mr. Fitzmaurice concluded that he really didn't need to focus on the cause of death and go out and hire an independent attorney. You don't think it would have been more helpful to have somebody who testified that he wasn't killed with a knife stick, it was with a rock, exactly the way his client had told him? Your Honor, I have no doubt that it could have been more helpful. The question is, was it unreasonable for him, based upon his conclusion or based upon his investigation, to make that statement? Do you think it's enough to rely on Dr. Syhick's testimony? What is it in Dr. Syhick's testimony that you think could cause a jury to acquit the defendant? It was the inconsistencies from Dr. – between Dr. Syhick's testimony and Brian's testimony. Brian's testimony in many regards simply did not mesh with the forensics that Dr. Syhick testified to. You said specifically, specifically, Brian said that the blows were to the back of the head. Dr. Syhick said no. One was to the front of the face, off to the side on both victims, as I recall that particular testimony. Well, he said it could have been done by a stick. Unquestionably, he said it could have been done by a stick, but what – But he didn't say that it was more likely by a rock. Dr. Syhick never testified anything about – But the story that this lawyer was told, the defense lawyer, by his client, was that my brother did it with a rock. And he could have had a forensic expert who would have testified that that was probably how it happened. But Dr. Syhick didn't testify that it wasn't a rock. Did counsel even ask Dr. Syhick whether a rock could have caused the blow? The rock was never raised during the course of the trial. Nobody ever mentioned the rock. Nobody used the word rock. There was – it was a blunt instrument. And the closest we got to what I would consider a rock, other than the stick, was the butt of the gun. Without questioning the decision not to put Mark on the stand, why doesn't Fitzmores at least have an obligation to introduce the possibility that there was something else other than a nightstick that was used to kill the victims? And to introduce that – to extract out of SEAC that it was possible that it was something else that then would call into question Brian's testimony. That's what happened. The word rock, Your Honor, was not used. But Dr. Syhick was very clear in his testimony regarding the cause of death for – excuse me, the instrumentality for both victims, that he didn't know what it was other than it was a blunt object. It could be a stick. It could be the butt of a gun. But he didn't know, and that was brought out. Although the question of relative weight between a rock and the use of a stick or a nightstick is pretty substantial. Is there anything drawn out on that? Not from Dr. Syhick, Your Honor. The density of a rock is quite a bit – is substantially greater than the density of a stick. Unquestionably. There was testimony from Dr. Syhick and at the evidentiary hearing from Dr. Gray that certainly a stick – Dr. Gray said it was possible that it could be a stick. Dr. Syhick, I don't recall if he stated the probabilities of the stick, but both of them testified at a minimum that it was possible. It would just require extraordinary force to have occurred. And do you agree with Mr. Parnes that the nightstick that was found in the Camaro was not introduced and that any other small stick was also not introduced? That is absolutely correct, Your Honor. There was no – So all we have then from Brian is his testimony that there was a stick that he may or may not have gotten from his ex-wife, that he may or may not have given to Mark, that was maybe about 12 inches long, didn't look like the stick that was found by the police in the Camaro, and was never found, never recovered, was the weapon. That is correct, Your Honor. There was – I don't even recall if there was – as I do recall, there was testing done on the nightstick and there was nothing – it couldn't be connected to the crime in any way, shape or form. Let me ask you this, if I might. I'm just going to refer to the testimony by Mr. Roark at the district court. He's asked, Having reviewed this case, what's your opinion regarding what a reasonably confident attorney would have done in the mid-'80s in Idaho regarding retention of a forensic expert in this case? Answer. Oh, in this case, I feel very strongly that a reasonably confident attorney handling a capital case would have retained and relied upon and called his or her own forensic pathologist. Hence, what's that opinion based on? That is based on 25 years, over 200 jury trials. When a case turns, at least for the theory of the case, on a piece of forensic evidence, there's simply no substitute for having your own forensic expert retained available to you, ready to testify. Do you disagree with that? This is not yet to the question of prejudice. I understand that, Your Honor. Would a reasonably confident attorney in Idaho in the mid-'80s in a capital case have retained his own forensic expert? Again, I hate to concede the deficient performance problem, Your Honor. I know you do. Because I believe that there was an investigation that was done by Mr. Fitzmaurice, and as a result of that investigation, I believe that his decision not to retain an expert was reasonable. Is it something that I would have done? I've never practiced criminal law, but yes. I don't know if that answers your question or not, Your Honor. Well, it doesn't. It doesn't. You say you don't have from your own personal experience an independent basis for knowing. Yes. Based upon my years of prosecution, I would have hired one. You say you would have. Yes. Yes. That's what I was saying. I don't have a criminal defense background, but from my own experience, I know how tough capital cases are to defend and prosecute. I know what's at stake. I've been doing it for a number of years. I would have hired, I would have at least consulted with a forensic, with a pathologist. With your own. Yes. Yes, I would have, Your Honor. And this is now Dr. Gray's testimony, again, at that same district court. I'm sorry, Your Honor. You said it's Dr. Gray's testimony? This is now Dr. Gray's testimony. Yes. I'm talking about the forensic pathologist that's now been retained in front of the district court. Yes. Question. Can you describe for us how much force would have been necessary to have been inflicted if it was going to have been done, this injury pattern, if this was in depth to have been done by, sorry for the garble, but this is the way it was, three blows to the back of the head with an unweighted stick approximately 12 inches long? How much force are we looking at that would have been required? Answer. I can't see that that pattern would be produced by a stick with that scenario that you described, even with as much force as you could possibly muster. I don't see how you could get that pattern. He then qualifies to say, well, a different pattern of blows, repeated blows, it's possible later in his testimony, but I see this as a direct contradiction to what Brian is testifying to. In other words, he's saying, given what Brian testified to, there is no way a nightstick could have done it. Is that how you construe that testimony? Your Honor, I believe if we look at the testimony as a whole, and I wish I had the exact page citations to the excerpt to the transcript. I don't believe they're in the excerpts. But as I recall Dr. Gray's testimony, he qualified that opinion. Well, he qualifies at the end. I'll read it to you if you like. But he says, when he's asked, is it possible that a nightstick could have done this, he says, yes, it's possible, but I'm now paraphrasing it, but it would have had to have been done with an enormous amount of force repeatedly and with a very different pattern of blows than were described in Brian's testimony. That's what he says. And I don't doubt that part. What I'm saying is, Your Honor, is that I think it was qualified. And that, of course, leads us. I'm sorry? And qualified in that way. And I think you and I are in agreement on what that qualification is. And that does, of course, lead us into the prejudice prong of where and what difference would it have made. And quite frankly, I don't believe it would have made any difference. Brian, there was a question about would it have made a difference. Different decision about putting Mark on the stand. That was the exact question I was going to answer, Your Honor. I know that you had asked a question about would the prosecutor have called Brian. Absolutely. And the reason the prosecutor had to call Brian, and I'll just lay my cards out on the table here, there was no case without Brian. No, my question was a little different. I'm sorry, Your Honor? If Fitzmaurice had hired a pathologist, would he have made, and he had made a different decision about whether to call Mark to the stand. Oh, I'm sorry, Mark. Is there prejudice? I'm sorry, Mark. I know there's no case without Brian. Now, the question that I think they were trying to face here is, is there no reasonable defense without Mark? Well, there's a reasonable defense, and that was the defense that was presented, and that is that Brian's story is just so full of inconsistencies, but it's so incredible. Assuming, and I know you don't concede this, but assuming that it was ineffective assistance of counsel not to have engaged a separate pathologist. Yes, Your Honor. Why isn't there prejudice? I still don't believe Mark would have been called as a witness. Before you get to Mark as a witness, you said the whole case is whether they believe or don't believe Brian. All right. Why wouldn't the pathologist's testimony have been important in discrediting Brian's story? Because Brian's testimony was significantly impeached as it was. Well, if the whole case depends on Brian's credibility and he was so badly impeached, how do you get a conviction? Because. . . I mean, obviously he wasn't impeached badly enough. Well, obviously. All right. And now you have this forensic expert who would impeach him. All the forensic expert's testimony is is cumulative evidence to Dr. Sajak's testimony. Dr. Sajak's testimony, the forensics was the blow is to the face. Brian's testimony is, no, what I saw was to the back. This is testimony that it wasn't done with a stick. In all likelihood, it was done with a rock. Now, that certainly impeaches Brian further than he was previously impeached. And the question is, how badly do you need to impeach Brian to get a not guilty verdict? And I certainly had to do it more than what was done. Yes. And I have to say that Dr. Sajak's testimony wasn't quite. . . And the only inconsistency between Dr. Sajak's testimony and Brian's testimony was not he says it to the face and Brian says it to the back. Well, one of the blows was to the side of the face. Yes. But there were some blows to the back. I mean, the photographs were introduced. And I understand Mr. Fitzmaurice objected to their being introduced because they were too gruesome and so on. They were nonetheless introduced. But the photographs of the reconstructed skull show very clearly that there are holes in the skulls in the back of the skull, not low but high. So, I mean, we don't have inconsistency between the actual forensic evidence in the form of the photographs and Brian saying, well, he hit him in the back, well, maybe it was neck, maybe it was high. But that contradiction between what they heard and saw and you're saying, well, Sajak says the face, he said the back, that inconsistency didn't really exist. With due respect, Your Honor, I think it did because as I recall Dr. Sajak's testimony, he explained those photographs and those holes and explained that there were actually portions of the skull that they didn't have. And I think they call them spider patterns, where Dr. Sajak was able to actually determine where the blows took place. Merely because there was a piece of the skull missing does not mean that there was a blow to that portion of the skull. Who called Dr. Sajak? The state did, Your Honor. Well, they couldn't have thought he was a very damaging witness to their case. Oh, absolutely not. I mean, he testified. So why would you think that the defense lawyer would rely on him to win the case rather than an expert who would have testified that it was Iraq? Your Honor, I don't – reliance – I'm not sure I – semantics. I think the theory of the case was not – they did rely upon Dr. Sajak because they didn't go out and hire – he didn't go out and hire his own pathologist. But the key to the case was Brian. And he was going to repeatedly impeach Brian. Okay. And isn't the best way to impeach Brian? I'm sorry, Your Honor? Isn't the best way to show that it wasn't done with an ice pick? But I think that that was done with Dr. Sajak when he testified. I don't know what the object was. I mean, the state didn't think that, did they? Well, the state wasn't concerned at all about the nature of the object. It was simply that there was a murder and that the cause of death was blunt trauma. And they thought that if you could show that the only witness was lying as to how it happened, that wasn't a problem? Oh, that's a big problem. But what I'm saying, Your Honor, is that the state never focused on – But Dr. Sajak didn't – the state didn't think that Dr. Sajak showed that Brian was lying as to how the death happened. Well, what I'm saying, Your Honor, is that the instrumentality was not the focus of anybody's case, the state or the defense. Well, that was – that's the problem. And in fact – Let's get to the second part about what Judge Bradley was asking you about. What effect could a good investigation have had on the decision whether to call Mark? Counsel today says that, of course, if the investigation had been conducted and you found out that Mark's story, that he was told about the death by Brian, that it was done with a rock, that you could prove Mark's story, that then you would put Mark on the stand, even though you might not put him on the stand without any support for his story. What's your answer to that? The problem with that is that Fitzmaurice testified that Mark Langford was basically – my words, but it was during the cross-examination and the evidentiary hearing – Mark Langford was going to be a terrible witness. And that was pretty well exhibited by a couple of things. Not only did we have Fitzmaurice's testimony that he would have been a terrible witness with no credibility, but we had Mark's explosive outburst in front of the jury. His cross-examination, which I recognize the trial court concluded was somewhat effective. I personally didn't find it real effective. But the bottom line on it is that counsel wanted to keep the focus upon Mark's credibility. He didn't want to bring Mark – or excuse me, Brian's testimony. He didn't want to bring Mark's credibility into this mix because Mark was going to be incredible. Could he make that judgment before making a complete investigation? Oh, absolutely, based upon his interaction with Mark. He knew that Mark, as I recall Fitzmaurice's testimony at the evidentiary hearing, he knew that Mark had an explosive temper. I would submit that he was terrified of Mark being cross-examined and Mark having yet another eruption in front of that jury. Although it seems a little premature on the part of defense counsel to make that judgment without even engaging a separate pathologist. I think that's a categorical – under no circumstances will I put him up here, even if I know that I've got powerful evidence that is more specific and more direct than Dr. Seax. But, Your Honor, I think that you can make that determination with your client, particularly where it's ultimately the client's determination as to whether they testify or not, not counsel's. I recognize counsel recommended that he not testify. Counsel, before your time expires, would you please address the question of ineffective assistance of counsel on the rendering of the jury instructions? This would be – this is number 10, which the district court – on which the district court found ineffective assistance of counsel to conclude there was no prejudice. Yes, Your Honor. Again – Is the state going to concede the ineffective assistance of counsel and then go on to the prejudice points the district court did, or are you going to contend with that? The problem with that, Your Honor, is that if you look at what Fitzmaurice did in his closing argument, he pounded instruction 24A as a means of – to have the jury – let me start that over. He pounded 24A before the jury so that the jury would know how to judge Brian's credibility. I recognize that it is probably improper to submit an instruction that is contrary to state law, and there's no question 24A was. But he wanted to use that instruction so that he could argue in front of the jury, how do you judge Brian's credibility? So I can't concede deficient performance based upon that. I'm not – I don't know that it was a good strategy, but it was certainly one that he considered. But unquestionably, there can't be any prejudice in this case as a result of that instruction. There were two other instructions that were given, and the – Yeah, although as I look at those instructions, and they were given in the order – I believe that they were given so that the incorrect instruction was first, followed by the two correct instructions, which were substantially longer than the first one. And then here's what are two correct instructions that are substantially longer, and which perhaps a jury might have thought were simply ways of describing what happens if you do have corroborating evidence. But the first instruction they've heard tells them that they don't have to have corroborating evidence, and that instruction was wrong. It was, Your Honor. And actually, I misspoke. It wasn't 24A. It was 15 was the bad instruction. And 15 was given before number 18, and there was another one that was given that was – that was correct. The problem that I have with instruction 15 is that if you read it in its entirety, it's really, for the layman, a fairly complex instruction. Whereas, if you look at instruction 18, it is extraordinarily succinct and specific. You are instructed that a defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated. That is succinct and specific, as opposed to 15, which says, The testimony of one who asserts by his testimony that he is an accomplice may be received in evidence and considered by the jury, even though not corroborated by other evidence and given such weight as the jury feels it should have. And it goes on. It's a two-paragraph instruction as opposed to 18. I think that 18 is very succinct. Yes, Your Honor. So 16 – I'm sorry. I've got – I'm looking at the district court's opinion, and I'm looking at pages 19 and 20, and I think maybe I've got a different set of numbers here. I'm showing 16, 19, and 20. And you're referring to 15, 18, and – 394, Your Honor, is the bad instruction. 394 of the excerpts of record is the bad one. Because it does state – there's a phrase in there, even though not corroborated by other evidence. By other evidence, yes. The district court is showing that as defendants requested instruction number 16, but perhaps it's requested is the key here as opposed to the actual instruction given. It is, Your Honor, and I explained that in my brief. I am referring to the instructions actually given, not the requested instructions. I'm sorry. I think it's important also that the very next instruction that was given on page 395 of the record, you are instructed that the fact that a co-defendant has been found guilty of the offense charged is not evidence in and of itself of the guilt of another person. I think that establishes that you can't rely upon, again, just Brian's testimony, the fact that he's been found guilty of this murder. So I don't – I just don't see the prejudice in this, particularly when you look at the overwhelming amount of – overwhelming is an overstatement. The corroboration. Is the bad instruction set forth in one of the briefs? Verbatim? Yes, Your Honor. I believe the bad – if I could have a moment, Your Honor. Let's see. Oh, okay. That's the bad one. Okay. I'm sorry. Thank you. Never mind. I'm sorry, Your Honor. It's on page number four. Your Honor, in the 20 seconds I have left, I did want to discuss Ferretta just very briefly. Can I – before you get to Ferretta. Yes. I just want to read to you from a tiny note. I'm not going to read out any piece of Dr. Syack's testimony on the issue as to whether or not there was some contradiction between his testimony and Brian's testimony. You're saying, well, Dr. Syack testifies that the blows are to the face and Brian said from the back. The question – this is at trial now.  Yes. What conclusions – this is now questioning to Dr. Syack. I'm on page – bait stamp 487, but I don't – you don't need to find it. What conclusions were you able to draw as a result of the reconstruction of 68, which you found to be the female? In case 68, we felt there were probably three – at least three areas of force, that is from the front, left, lateral, and posterior area that we felt force had been applied. That sounds like the back to me. So we're not getting much of a conflict between Brian and Dr. Syack. We may be getting some, but not much. Your Honor, it's correct. It does say posterior as to – I believe that's Cheryl. Yes, right. Yes. Yeah, that's female. That's correct. Yes. But certainly I don't believe there's any such testimony with regard to Robert. Right. But we're kind of pecking away at him rather than sort of direct conflict between Syack and Brian in terms of where the blows were and so on. Yes. Okay. I see my time is up, Your Honors. I did have just one statement about Ferrett, if I may. Ferrett is covered pretty well in our brief, but in the Lopez case, the Court did talk about substantial and injurious harm. I know that counsel has said you can't consider harmless error in the issue of Ferrett, but certainly under Lopez, the Court indicated that it could. And based upon the cross-examination completed ultimately by Mr. Fritz Morse, if there was error, and we certainly are not even close to conceding that, it certainly has been shown that there was substantial and injurious harm. Thank you, Your Honors. Thank you very much, counsel. Your Honor, the State now concedes that there is no case without Brian. There's no case against Mark without Brian. That's the first time that's been conceded, and I think that's very important. It's very important as to the accomplice instruction, because basically the improper instruction that was requested by counsel that is not the State law, that is not the statute that describes what is admissible as accomplice testimony, said and informed the jury that they could rely entirely on Brian if they wanted to. They could so choose without any corroboration, without anything, they could rely on Brian. And it's exactly why Brian is so critical in this case, and yet trial counsel did very little, not nothing, but very little, and didn't follow through on any significant impeachment of Brian on the critical factor that he knew. Unless there are questions, the only other thing that I want to say about the plea, and I understand that I'm probably running a little uphill, but the jury was told, and it's at excerpts of record 340, excuse me, 234, and this is where Mark asked Brian about what was offered. And Brian's answer is, they said I would probably get an indeterminate life sentence. That's a statement. I would probably get. They told me that I'd probably get that. There's no offer. There's nothing that they would be bound by that we only find out in 1995. But isn't the question here, counsel, whether the jury was aware that Brian had some incentive to misrepresent the facts on the stand. Isn't that the critical thing for the jury? No, the critical thing for a jury is to understand what the nature of that offer is. This is a person who's not just getting a few, a dismissal of some charges as in Hays. It's not a situation where he is understanding that the jury is going to fully understand what the significance of it is. He's probably going to get a life sentence instead of being executed. No, that he – that the prosecutor is so – that this information is so critical that the prosecutor has made a binding, enforceable agreement with him that the prosecutor is going to recommend to the judge a life sentence. And that's what was kept from this jury. That's very, very different than I may get a life sentence. And, in fact, when – does the prosecutor do anything to, you know, to rebut that? No, there's no other evidence necessarily in there. But what does the prosecutor argue to the jury in closing? And I'll quote in his closing argument. I think it's at 367, 368 of the excerpts, and I may be wrong on that. Now, counsel will probably make a great deal or try to make a great deal of the fact that Brian was promised something. Well, we have an immunity agreement. You can read that. The court approved it, and I'd ask you to read the language used in approving that. That is vouching for the fact that there was no other agreement and that Brian was – misunderstood what was going on. In fact, if you go back to the discussions with the – with counsel beforehand, the judge makes a finding that Brian's misunderstood what the deal is. And you, as he first said – But the jury didn't know. They didn't know that, but he – The jury knew was what Brian said and what the prosecutor said in the closing argument. Right. But what's important, too, in here is that the trial judge said to Brian and to Longtee, Brian's counsel, and to the prosecutor, you better clarify this in front of the jury. You better make sure that the jury understands that there is no promise because Brian misunderstands it. And the critical thing is the jury should have known that this prosecutor felt that his case was so dependent on Brian that, as Mr. Anderson says now, that we are prepared to make a recommendation that's going to be binding not just tomorrow but for 20 years. Because in 1999, Mr. Anderson stood up and said, I'm bound, at Brian's sentencing, I am bound to recommend the sentence that was originally agreed upon. A lot of things happened in between. There were court findings, too. Okay. I think there's something I would like to ask you both, counsel. Will you both notify us within 10 days? We have a mediation process which we have used generally in civil cases in the court, but we have used in criminal cases and in capital cases. In fact, a capital case was settled. Was that in Idaho? It was in Idaho. And Mr. Anderson and I both, we did the mediation. Oh, and you're familiar with the process. We are. And it was successful mediation. Could you want to let us know in 10 days? You don't have to – just give us a joint letter that says either we would be interested in the mediation process or that we are not, and you don't have to tell us which of you is not or whether both of you are. Just give us a joint letter that tells us whether you're interested. We'll do so. Because this is a case you might – could well both benefit from in the mediation. All right. Thank you very much. Thank you.
judges: Reinhardt, W. Fletcher, Bybee